## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ISRAEL KATZ, 17849 Margate Street, Apt. 306, Encino, CA 91316, on behalf of himself and all others similarly situated,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>AMERICAN AIRLINES, INC., DELTA AIRLINES, INC., SOUTHWEST AIRLINES CO., and UNITED AIRLINES, INC.,<br><br>　　　　　Defendants. | Case No. 15-cv-1741<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

## INTRODUCTION

1.　　This is an antitrust class action arising from a conspiracy by Defendants American Airlines, Inc. ("American"), Delta Airlines, Inc. ("Delta"), Southwest Airlines Co. ("Southwest"), and United Airlines, Inc. ("United") (collectively "Defendants") to fix, raise, maintain, or stabilize the price of domestic airline tickets in violation of Sections 1 and 3 of the Sherman Act.  Defendants effectuated this conspiracy through a number of mechanisms, including by constraining the seating capacity on flights within the United States; limiting the number of flights offered within the United States; and limiting the transparency of pricing information available to domestic airline ticket consumers regarding flights within the United States.  Plaintiff Israel Katz brings this action on behalf of himself, individually, and on behalf of a proposed class of direct purchasers of domestic airline tickets from one or more of the named Defendants (those direct purchasers defined herein as the "Class") between July 2011 and the present (the "Class Period").

2.      Before a recent round of mergers among the major U.S. airlines within the past ten years, the airline industry was already highly concentrated.  Since that time, it has become even more concentrated, with the four Defendants now controlling over 80% of flights within, to, or from the United States.  During one of the most recent mergers (between American and US Airways), the United States Department of Justice ("DOJ") expressed concern that consolidation within the industry would lead to increased coordination among the remaining airline carriers.  Although the DOJ reluctantly approved the merger, its concerns proved to be correct.

3.      Under the guise of the industry buzzword "capacity discipline," Defendants have conspired to cause domestic airline ticket prices to rise to and/or remain at supracompetitive levels.  This conspiracy was facilitated by Defendants' collective dominance in the domestic airline industry and their agreement to refrain from acts that hearken back to the industry's competitive past, when Defendants, acting independently, pursued capacity increases and market share ahead of inflated profits.  The Defendants have stated publicly that they viewed that competitive past as benefiting consumers at the airlines' expense.

4.      On information and belief, Defendants have furthered their conspiracy to raise prices and impose "capacity discipline" through behind-the-scenes communications and policing.  The few instances of public recrimination against each other demonstrate that there are open lines of communication between airline executives and that they have no qualms about forcing each other to stay in line and continue to exercise the discipline of an illegal cartel.

5.      Since the last wave of consolidation within the industry, domestic airline ticket prices have outpaced both inflation and competitive rates, and Defendants have reaped huge profits.  As a direct and proximate result of the conspiracy alleged herein, Defendants have

therefore restrained competition in the market for domestic airline tickets and injured Plaintiff and the proposed Class.

6.      In early July 2015, it was widely reported that the United States Department of Justice had sent civil investigative demands ("CIDs") to each of the Defendants.  A spokesperson for the DOJ, Emily Pierce, confirmed this report, stating that the DOJ is investigating "possible unlawful coordination" among the airlines.

7.      The operation of the conspiracy and its effects on the market are confirmed by the facts that:  (1) after years of capacity increases, and despite increasing demand for domestic flights, domestic airline capacity suddenly stabilized in 2011 through the remainder of the Class Period; (2) as Defendants maintained their capacity constraints, airfares increased to record levels; (3) fares increased even as airlines became more fuel efficient and fuel prices stopped rising; and (4) airline prices experienced a structural break in 2011 as actual prices substantially inflated above predicted prices.

8.      Plaintiff and members of the Class have each paid a higher price for domestic airline tickets than they would have paid absent the concerted unlawful activity alleged herein. Plaintiff therefore seeks damages on behalf of himself and the Class for the inflated domestic airline ticket prices Defendants' illegal conduct caused.

## PARTIES

**A.      Plaintiff**

9.      On March 24, 2014, Plaintiff Israel Katz, a resident of Encino, California, purchased a domestic ticket from Defendant Southwest for a one-way flight in April 2014 from Chicago to Los Angeles.

B.     **Defendants**

10.     Defendant American is a Delaware corporation with headquarters in Fort Worth, Texas.  American is a subsidiary of American Airlines Group, Inc., also based in Fort Worth. American Airlines Group, Inc. is also the holding company controlling US Airways, which merged with American in 2013.  Combined, American, US Airways, American Eagle, and US Airways Express run 6,700 flights per day to 339 destinations in 54 countries.  In 2014, American flew 194 million passengers and operated 983 mainline jets.  American Airlines Group reported a net operating income of $5.073 billion and net income of $4.184 billion in 2014, up from $1.935 billion net operating income and $1.244 net income in 2013.  Prior to 2013, American Airlines Group posted losses for three years.

11.     Defendant Delta is a Delaware corporation with its principle place of business in Atlanta, Georgia.  Delta, and related Delta Connection carriers, fly approximately 15,000 flights per day to 334 different destinations in 64 countries.   Delta serves 170 million customers per year and operates over 700 aircraft.  Delta's operating income in 2014 was $2.206 billion and its net income was $659 million.  In 2013, Delta's operating income was $3.4 billion and its net income, accounting for an $8 billion income tax benefit, was $2.527 billion.

12.     Defendant Southwest is a Texas corporation with headquarters in Dallas, Texas. Southwest flies approximately 3,600 flights a day to seven countries.  Southwest serves over 100 million customers annually, and is the largest carrier in terms of "originating domestic passengers boarded."  In 2014, Southwest had an operating income of $2.2 billion and a net income of $1.1 billion.  Southwest's common stock (LUV) rose 125% in 2014 and was the top performer in the S&P 500.

13.     Defendant United is a Delaware corporation with headquarters in Chicago, Illinois.  United is a wholly owned subsidiary of United Continental Holdings, Inc., a Delaware corporation also headquartered in Chicago.  In 2013, United merged with Continental Airlines. United flies approximately 5,000 flights a day, to 373 destinations in 60 countries.  In 2014, it operated 691 mainline jets and 531 regional jets, serving 138 million passengers.  In 2014, United had an operating income of $2.373 billion and a net income of $1.132 billion.  A year earlier, in 2013, United had an operating income of $1.249 billion and a net income of $571 million.

## UNNAMED CO-CONSPIRATORS

14.     On information and belief, at all relevant times, other airlines, entities, and/or persons willingly conspired with Defendants in their unlawful restraint of trade.  All averments herein against Defendants are also averred against these unnamed co-conspirators.

## JURISDICTION AND VENUE

15.     This complaint is filed under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, equitable relief, costs of suit, and reasonable attorneys' fees for violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 & 3.  The Court has original federal question jurisdiction over the Sherman Act claim asserted in this complaint pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

16.     Venue is proper in this District pursuant to sections 4(a) and 12 of the Clayton Act, 28 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c) and (d), because at all times relevant to the Complaint, Defendants resided, transacted business, were found within, and/or had agents within this District, and a substantial part of the events giving rise to Plaintiff's claims occurred

and a substantial portion of the affected interstate trade and commerce described below has been carried out in this District.

17.    This Court has personal jurisdiction over Defendants because, *inter alia*, each: (a) transacted business in this District; (b) directly sold and delivered passenger air transportation in this District; (c) has substantial aggregate contacts with this District; and (d) engaged in an illegal price-fixing conspiracy and agreement to limit capacity that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

18.    In addition to these bases for jurisdiction and venue, the DOJ's investigation into the conspiracy alleged herein originates out of and is being run by the Antitrust Division's Transportation, Energy, and Agriculture Section, which is based in Washington, D.C.  The DOJ's previous challenge to the American-US Airways merger also originated out of the Transportation, Energy, and Agriculture Section's Washington, D.C. office.

## CLASS ACTION ALLEGATIONS

19.    Plaintiff brings this action as a class action under Rule 23 (a) and (b) of the Federal Rules of Civil Procedure, on behalf of himself and others similarly situated.  The proposed "Class" is defined as:

> All persons and entities who purchased domestic airline tickets directly from one or more Defendant during the Class Period.  Excluded from the Class are Defendants, any subsidiaries or affiliates of Defendants, and any of Defendants' co-conspirators, whether or not named as a Defendant in this Complaint and all governmental entities, and any judges or justices assigned to hear any aspect of this action.

20.    While the exact number of Class members is unknown to Plaintiff at this time, Plaintiff believes that the identities of Class members can be readily ascertained from Defendants' books and records.  Given the magnitude of the commerce involved, there are most

likely at least hundreds of thousands of class members geographically dispersed throughout the United States, making joinder of all members impracticable.

21.     Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and all members of the Class directly purchased domestic airline tickets from one or more of the Defendants.  Plaintiff and the other members of the Class were damaged by the same wrongful conduct of the Defendants and the relief sought is common to the Class.

22.     Plaintiff will fairly and adequately protect the interests of the members of the Class and is represented by competent counsel experienced in antitrust and class action litigation.

23.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

a.     Whether Defendants conspired, contracted or combined with others, for the purpose and with the effect of raising, fixing, maintaining, pegging, or stabilizing the price of domestic airline tickets sold in the United States;

b.     Whether Defendants' conduct violated federal antitrust laws;

c.     Whether Defendants' conduct caused the price of domestic airline tickets sold in the United States to be artificially high and at supracompetitive levels; and

d.     Whether Defendants' conduct caused injury to the business and property of Plaintiff and the Class and, if so, the proper measure of damages.

24.     A class action is superior to any other available methods for the fair and efficient adjudication of this controversy, since joinder of all Class members is impracticable and the cost of litigation would likely far outweigh the likely value of individual Class member claims.  At the same time, the prosecution of separate actions by individual members of the Class would

impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort and expense and would assure uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.  No difficulty is anticipated in the management of this action as a class action.

## INTERSTATE TRADE AND COMMERCE

25.     The conduct of Defendants and their co-conspirators has taken place in, and affected the continuous flow of interstate trade and commerce of the United States, in that, *inter alia*:

a.     Defendants and their co-conspirators have sold domestic airline tickets throughout the United States;

b.     Defendants and their co-conspirators have each used instrumentalities of interstate commerce to sell domestic airline tickets throughout the United States;

c.     The conspiracy alleged herein has affected billions of dollars of commerce.  Defendants and their co-conspirators have inflicted antitrust injury by artificially raising prices paid by Plaintiff and other entities who are themselves engaged in commerce.

## FACTUAL ALLEGATIONS

**A.     Background on the Airline Industry and Its Current Unprecedented Profits**

26.     In 1978, Congress passed the Airline Deregulation Act ("ADA"), which deregulated the domestic airline industry.  The ADA removed government control over fares, routes, and market entry of new airlines, allowing market forces to dictate these and other facets of the industry.  Since 1978, Defendants have therefore ostensibly competed over fares, routes,

and seats.  Consumers within the domestic airline travel market have relied upon this supposed head-to-head competition to promote affordability, innovation, and service.

27.     One example of now-absent competition between Defendants was known as the "Southwest effect," so named for the measurable effect Defendant Southwest had as a new entrant to domestic airline markets when it was still a relatively young airline and not entrenched in the mature portion of the domestic airline industry.  The term was coined in 1993 by the U.S. Department of Transportation and referred to three procompetitive effects an airline had when it entered a new city-pair flight path market; *i.e.*, increased capacity within the market.  First, the new-entrant airline increased supply and offered lower prices.  Second, incumbent airlines responded to the new entrant by lowering their own fares.  Third, sales rose for all airlines in the market because the drop in fares stimulated business and increase demand for air transportation. This in turn increased the revenues of all airlines offering transportation to the community, and sometimes resulted in a net profit increase.

28.     Since the early 1990s, however, Southwest has grown and matured and now is on par with the other Defendants in terms of annual revenues and overall domestic airline market share.  Indeed, although American, Delta, and United are known in the industry as the "legacy" airlines due to their relative age and history in the industry, Southwest has moved far past its upstart days and is now part of the establishment.  The Southwest Effect is no more, and Southwest no longer disrupts the industry by increasing capacity; indeed, quite the opposite.

29.     Defendants' conspiracy has been enabled by, among other things, near unprecedented levels of concentration within the industry.  As a result of a series of mergers,

Defendants American, Delta, United, and Southwest, the four largest airlines in the United States by far, now control approximately 70% of the domestic airline market.[1]

30.     The airline industry has earned record profits, including a combined $19.7 billion in profits in the past two years.  The International Air Transport Association ("IATA"), an international trade body representing over 240 domestic and international airlines, and of which the four Defendants are all members, predicts that North American airlines will obtain approximately $13.2 billion in net after-tax profits in 2015, a number that exceeds the industry's previous peak profits from the 1990s.

31.     According to data from the federal Department of Transportation's Bureau of Transportation Statistics, the average domestic airfare rose at an inflation-adjusted 13 percent from 2009 to 2014.  News sources report that the airlines also collected $3.6 billion in bag fees and $3 billion in reservation-change fees in the past two years.  As discussed further below, much of this rise in prices results directly from Defendants' mutual commitment to keep airline capacity artificially low.  Defendants also engaged in a concerted campaign to reduce consumers' ability to compare airfares by limiting online travel agencies' ("OTAs") access to fare data and by forcing consumers to use Defendants' websites rather than other retail channels for domestic airline tickets.

32.     Emblematic of Defendants' conspiracy is the lack of price movement in response to recent, significant decreases in the cost of jet fuel.  One estimate found that for April 2015, United States airlines paid $1.94 per gallon for jet fuel, a decrease of 34% from the previous

---

[1]   These mergers began in 2005 with the merger between US Airways and America West.  In 2008, Delta and Northwest Airlines merged.  In 2010, United and Continental merged.  In 2011, Southwest and AirTran merged.  In 2013, American and US Airways merged, creating the largest airline in the world.

year.  Nevertheless, airfares have continued to rise, regardless of the decrease in airline operating costs.

33.     Other studies have shown this same counterintuitive trend.  From 2004-2009, average real fares across hubs declined almost 12%.  The American Antitrust Institute notes that this was likely due to the 2008 recession, softening demand for air travel, and excess capacity.[2] In the same time period, however, real fuel costs *increased* by 33%.  But during the Class Period, the exact opposite trend has occurred.  As discussed further in Section H, during the Class Period, airfares have increased to record levels even as airlines have become more fuel efficient and fuel prices have stabilized.

34.     In December 2014, United States Senator Charles E. Schumer (D-NY) called for a federal investigation of United States airlines.  As Senator Schumer stated:  "At a time when the cost of fuel is plummeting and profits are rising, it is curious and confounding that ticket prices are sky-high and defying economic gravity. . . .  The industry often raises prices in a flash when oil prices spike, yet they appear not to be adjusting for the historic decline in the cost of fuel; ticket prices should not shoot up like a rocket and come down like a feather."  Senator Schumer also noted that airlines were set to make a profit of $7.08 per passenger in 2015, up from $6.02 in 2014 and $3.38 in 2013.

35.     Much of this problem, including Defendants' conspiracy discussed further below, stems directly from the mergers and acquisitions that have enabled the four Defendants to dominate the U.S. airline market.  As an initial matter, the mergers resulted in *less* industry efficiencies, not more.  For example, the American Antitrust Institute found that system

---

[2]  Letter from Diana L. Moss, President of the Am. Antitrust Inst., to William J. Baer, Assistant Attorney General (Sept. 22, 2015), at 4, *available at* http://www.antitrustinstitute.org/sites/default/files/Letter%20to%20DOJ_Collusion%20Probe_F. pdf.

integration between merging airlines (*e.g.*, combining reservation and IT systems and workforces) was difficult, protracted, and more costly than anything that was predicted by the airlines when they made their case to antitrust enforcers.[3]  The newly combined airlines also cut numerous airport pairs from their networks, thus reducing consumers' options for flights substantially.[4]  Delays for low cost carriers have also increased substantially due to congestion from Defendants' dominance at their hubs, heightened incentives to create delays by Defendants for their smaller rivals, and pressures for low cost carriers to bracket flights around those of the network carriers (as opposed to scheduling flights in off-peak times) in order to compete more efficiently.[5]

36.     The DOJ was concerned with exactly this scenario when it initially challenged the merger between American and US Airways in 2013.  *See United States v. US Airways Group, Inc.*, No. 1:13-cv-01236 (D.D.C.).  Specifically, the DOJ noted at the time that "[t]he structure of the industry is already conducive to coordinated behavior."  *Id.*  As one example, the DOJ noted that airlines closely watch each other's fares and consistently match each other's fare increases.  As another example, the DOJ pointed to the use of "cross-market incentives" ("CMIs") to deter fare wars.  "A CMI occurs where two or more airlines compete against each other on multiple routes.  If an airline offers discounted fares in one market, an affected competitor often responds with discounts in another market – a CMI – where the [original] discounting airline prefers a

---

[3]   Diana L. Moss, Am. Antitrust Inst., *Delivering The Benefits?  Efficiencies And Airline Mergers* (2013), *available at* http://www.antitrustinstitute.org/content/aai-issues-white-paper-delivering-benefits-efficiencies-and-airline-mergers.

[4]   For example, pre- to post-merger, Delta-Northwest cut 11% of the airport pairs from its network, United-Continental cut o 9%, and Southwest-AirTran cut 22%.  *See* Jack Nicas, *Airline Consolidation Hits Smaller Cities Hardest*, Wall St. J., Sept. 10, 2015, *available at* http://www.wsj.com/articles/airline-consolidation-hits-smaller-cities-hardest-1441912457.

[5]   Moss, *supra* note 2, at 16.

higher fare.  CMIs often cause an airline to withdraw fare discounts." *Id.*  In other words, the

airline industry is structured such that, to the extent there is an understanding or agreement to act

in conspiratorial ways, airline competitors would be (and are) able to punish each other quickly

for stepping out of line.  This creates a strong enforcement mechanism for any conspiratorial

activity.

      37.    The DOJ also noted past express coordinated behavior by the airlines in the

creation of the Airline Tariff Publishing Company ("ATPCO"), a "dedicated price-telegraph

network for the industry."  As the DOJ explained, "[t]he airlines use ATPCO to monitor and

analyze each other's fares and fare changes and implement strategies designed to coordinate

pricing.  Airlines have previously used ATPCO to engage in coordinated behavior.  In 1992, the

United States filed a lawsuit to stop several airlines, including [American and US Airways], from

using their ATPCO filings as a signaling device to facilitate agreements on fares.  That lawsuit

resulted in a consent decree, now expired."  Given past practice and the continued ability to this

day to confirm with each other regarding agreements on fares, this factor of the industry

similarly makes conspiratorial activity not only possible, but likely.

      38.    The DOJ's 2013 complaint also recounted a disturbing example of direct

communication between senior airline executives regarding pricing behavior:

> US Airways also has communicated directly with a competitor when it was upset
> by that competitor's efforts to compete more aggressively.  In 2010, one of US
> Airways' larger rivals extended a "triple miles" promotion that set off a market
> share battle among legacy carriers.  The rival airline was also expanding into new
> markets and was rumored to be returning planes to its fleet that had been
> mothballed during the recession.  US Airways' CEO complained about these
> aggressive maneuvers, stating to his senior executives that such actions were
> "hurting [the rival airline's] profitability – and unfortunately everyone else's."
> US Airways' senior management debated over email about how best to get the
> rival airline's attention and bring it back in line with the rest of the industry.  In
> that email thread, US Airways' CEO urged the other executives to "portray[ ]
> these guys as idiots to Wall Street and anyone else who'll listen."  Ultimately, to

make sure the message was received, US Airways' CEO forwarded the email chain—and its candid discussion about how aggressive competition would be bad for the industry—directly to the CEO of the rival airline. (The rival's CEO immediately responded that it was an inappropriate communication that he was referring to his general counsel.)

39.     The DOJ ultimately settled its case against American and US Airways by allowing the merger to occur on the condition that the merging airlines divest certain flight slots in order to permit competition with smaller competitors. Nevertheless, the combined America-US Airways entity now controls over 20% of domestic passenger revenue within the United States.

40.     The airline industry is also marked by significant barriers to entry, given (among other things) the need for government clearance to operate an airline along approved flight paths, the high cost of building out an airline fleet, the finite number of gates at airports throughout the nation, and the difficulty in obtaining initial or constant access to such gates.

41.     Defendants' conspiracy is also facilitated by their membership in trade associations, including, among others, Airlines for America and the IATA, at which executives of all four Defendants had the opportunity to meet with each other throughout the Class Period and discuss competitive information about the industry. Defendants also have a history of direct communication with each other regarding competitive issues, and have a network of financial analysts and other channels through which they can send messages to each other.

42.     Defendants' pricing behavior, as discussed herein, has been inconsistent with a competitive market.

**B.     Defendants Originally Failed to Limit Capacity in the Domestic Airline Industry in Any Meaningful Way**

43.     Before the Class Period, Defendants regularly failed in their unilateral efforts to limit capacity within the domestic airline industry.

14

44.     For many years before the Class Period, Defendants struggled to increase airfares. From 2004-2009, average real fares across hubs declined almost 12%. The American Antitrust Institute has observed that this was likely due to a combination of the 2008 recession, decreased demand for domestic airline travel, and excess capacity within the industry. The airlines' inability to raise fares was at least consistent with economic data from the period given that, at the same time, real fuel costs increased by 33%.[6]

45.     At industry gatherings, the airlines were not shy in discussing the risk that poor capacity discipline posed to profits. At the June 2010 IATA Annual General Meeting in Berlin, for example, IATA Director General and CEO Giovanni Bisignani gave a presentation on the "State of the Air Transport Industry," in which he expressed "cautious optimism" for the industry, but warned that it "will be a modest party" and airlines "face real downside risks."[7] Chief among those "downside risks" was "Capacity," and Mr. Bisignani warned against the "temptation" to compete for market share at the expense of profits: "Excess capacity is one. The upturn will bring temptation. 1,340 aircraft will be delivered this year and only 500 are for replacement. The *discipline of chasing profits, not market share, is the only way to protect the bottom line*."[8]

46.     One year later, at the June 2011 IATA Annual General Meeting in Singapore, IATA held an "Executive Briefing Session" on "Partnering for Profitability," at which cooperation, rather than "traditional industry silos," was identified as the path to "sustainable profitability":

---

[6]  Moss, *supra* note 2, at 4.

[7]  IATA, State of the Air Transport Industry, https://www.iata.org/pressroom/speeches/Pages/2010-06-07-01.aspx.

[8]  *Id.* (emphasis added).

Sustainable profitability has long proved elusive in the aviation industry, as most operators struggle to cover the cost of capital and grow investment. In this tough environment, individual actors in the air transport value chain strive to optimize their own interests. This session asks whether it is time to replace traditional industry silos with new partnerships, creating opportunities to expand the Industry value proposition and rebalance risk and rewards.[9]

**C.**     **Defendants Agree to Exercise "Capacity Discipline," and Police the Conspiracy by Reaffirming in Public and Private That They Are Adhering to the Agreement**

47.     Defendants heeded the call, and in 2011, began their collective efforts to rein in capacity and drive up airfares. Defendants' primary mechanism in their conspiracy to raise prices for airline consumers is their shared commitment to enforcing "capacity discipline." As used by Defendants, "capacity discipline" is a euphemism for limiting the number of flights and seats available to consumers. Defendants' conspiratorial efforts to offer only ever-higher fares for the artificially limited number of flights enabled Defendants to raise prices for domestic airline tickets to supracompetitive levels.

48.     The key to "capacity discipline," however, is that it will not be able to create outsized profits for an airline if that airline is the only competitor exercising such "discipline." Put differently, if a single airline reduces capacity on its flights and raises prices as a result, then travelers will turn to other airlines with more capacity and, thus, lower prices. But if other airlines act similarly – meaning travelers are faced with reduced capacity and higher prices at all turns – then travelers have no choice but to pay higher prices. The alternative is not to fly at all, which is an unacceptable option for many of Defendants' customers.

49.     For this reason, capacity discipline will only benefit an airline if it has reasonable assurance that it is either the exclusive (or near exclusive) carrier for a particular city-pair route, or, for city-pair routes with multiple carrier options, that its competitors will engage in the same

---

[9]  IATA, Executive Briefing Session 2 – Partnering for Profitability, https://www.iata.org/events/agm/2011/Pages/session2.aspx.

"discipline."  It would be against an airline's independent self-interest for it to exercise "capacity discipline" unless its competitors also do so.  In Defendants' case, their shared commitment to capacity discipline was made feasible and rational by their knowledge that each had agreed to engage in the same capacity limitations.

50.      This action against self-interest is exemplified by Delta's CEO, Richard Anderson, who recently stated:

> It's wonderful that fuel has run down—we love it.  There's a $2 billion opportunity out there if we hold fare levels constant.  But over the very long-term horizon, it's just more conservative and prudent to use a high fuel assumption when you're buying airplanes or making other investments, and then when it comes in lower, hang on to all of it.[10]

While it is certainly true that a company could benefit by holding prices steady when costs dip, to do so makes no economic sense when competitors could easily lower prices to reflect those lower costs.  The only scenario in which keeping prices steady notwithstanding public cost dips might make sense is if the company is confident that its competitors will not actually reduce their own prices.  Moreover, a company can only reasonably assume that high costs in the long-term will not change the short-term competitive scenario if that company is confident that its competitors will price based on the same long-term assumptions.

51.      Defendants also confirmed to each other that they remained committed to this agreement by publicly discussing their plans to continue exercising "capacity discipline," so long as other Defendants did the same.  For example, Jeff Sismek, the CEO of United, discussed United's $2 billion profits in 2014 and stated, "[w]e will absolutely not lose our capacity discipline . . . .  It's very healthy for us and very healthy for the industry."

---

[10]   Zainab Mulldalal, *The airline executives standing between you and cheap plane tickets*, Quartz (Jan. 13, 2015), *available at* http://qz.com/324981/the-airline-executives-standing-between-you-and-cheap-plane-tickets/.

52.     United has followed through on that promise, recently confirming in its 1Q2015 earnings announcement that the airline remains committed to capacity discipline, announcing that United's planned refinements to its fleet plan "will not impact the company's current 2015 capacity guidance, and are consistent with the company's focus on capacity discipline."

53.     Similarly, in announcing Delta's 2014 fourth quarter results, Delta's chief executive, Richard Anderson, stated, "As we begin 2015, we have a significant opportunity from lower fuel prices, which will drive more than $2 billion in fuel savings over 2014.  Through our capacity discipline, pricing our product to demand, and the fuel savings, we expect to drive double-digit earnings growth, along with increased free cash flow and a higher return on invested capital in the upcoming year."

54.     Similarly, Delta's Anderson (echoing the comments of United's Smisek cited above) stated:  "We are not making any changes to our 2015 capacity plan in light of the lower fuel prices. . . .  In fact, we continue to trim capacity on the margin to maintain yields."

55.     Prior to the American-US Airways merger, American had planned to expand domestically and internationally, adding additional flights and service on nearly 115 new routes. However, after the merger, the new American quashed that plan, choosing instead to toe the line with its competitors by exercising "capacity discipline."

56.     American's president, Scott Kirby, confirmed at an investment conference on March 3, 2015 that the company would not be adding capacity via additional airplanes:  "Almost all of our capacity growth domestically is about putting more seats on airplanes."  This type of capacity increase is *de minimis* and still permits the airline to charge higher rates because of the lack of additional flights.

57.    Indeed, as American's Kirby confirmed, each of the four Defendants were only interested in increasing capacity by way of cramming a relatively small number of additional seats onto airplanes:  "All airlines for the most part are putting more seats on airplanes.  We're doing it.  United's doing it.  Delta's doing it.  Even Southwest is continuing to put more seats on their existing aircraft.  *Once you've done that, you're done*."

58.    Defendants have furthered their conspiratorial capacity constraints by deferring new aircraft deliveries.  In February 2013, the CAPA Centre for Aviation published an article titled "Airline capacity discipline:  a new global religion delivers better margins – but for how long?"[11]  The article noted, "Capacity discipline appears to be helping mitigate the impact of a sluggish global economy and high fuel prices," and the industry has "decided to embark upon the righteous path as disciples of capacity discipline."

59.    Even though aircraft orders have followed their historical cyclical pattern that "sees a peak in orders about a year after a peak in airline operating margins and a trough in orders similarly lagging the margin trough," the CAPA article observed that "[a]ircraft deliveries no longer appear to follow a cycle."  While airlines are willing to "order new, more efficient technology in the face of the significant oil price increases," they "have been happy to wait for their delivery."  This "flattening of the deliveries curve has also directly led to the flattening of the rates of growth in the global aircraft fleet."

60.    As examples of Defendants' efforts to delay aircraft deliveries, in April 2015, American announced that it had asked Boeing to delay delivery of 787 planes by a year.  Four 787s originally scheduled to be delivered in 2016 would be delivered in 2017, and one other 787

---

[11]    CAPA Centre for Aviation, "Airline capacity discipline:  a new global religion delivers better margins – but for how long?" (Feb. 8, 2013), *available at* http://centreforaviation.com/analysis/airline-capacity-discipline-a-new-global-religion-delivers-better-margins---but-for-how-long-96762.

would be delivered in 2018.  In June 2015, it was announced that American was deferring delivery of 35 Airbus A320neo aircraft, originally scheduled for delivery in 2017 and 2018, to 2021 through 2023.

61.     In the few instances where it appeared that a Defendant might break from the capacity limitation conspiracy, the response was swift and effective.  On May 20, 2015, Gary C. Kelly, the CEO of Southwest, announced a break from the industry stance on discipline, stating that Southwest planned to increase its capacity by as much as eight percent by acquiring two new gates at its hub at Love Field, Dallas.  The industry reaction was instantaneous.  The stock prices of the other Defendants plummeted.  Raymond James analyst Savanthi Syth wrote in response to the shift:  "understandably, investors are questioning if this signals the end of the era of industry capacity discipline."  Additionally, Wolfe Research airline analyst Hunter Keay stated:  "Domestic capacity discipline has effectively vanished."

62.     As a result of this announcement, the other Defendants took action to ensure that Southwest did not destroy their collective capacity discipline.

63.     The IATA's annual meeting took place on June 7-9, 2015 in Miami, Florida. Chief executives of many of the leading passenger airlines were in attendance.  During the course of that meeting, several of them spoke publicly about the need for "discipline" within the industry.  Delta's President, Ed Bastian, said that Delta is "continuing with the discipline that the marketplace is expecting."  American's CEO, Douglas Parker, stated that the airlines had learned their lessons from past price wars, noting, "I think everybody in the industry understands that."

64.     On June 11, 2015, *The New York Times* published an article titled "'Discipline' for Airlines, Pain for Fliers," in which the author, James B. Stewart, commented:  "Discipline is classic oligopoly-speak for limiting flights and seats, higher prices and fatter profit margins.

This year, that discipline seems to be working:  the IATA projected this week that airline industry profits would more than double this year to nearly $30 billion, a record."  The New York Times also noted:

> When airline industry leaders say they're going to be disciplined, "they mean they don't want anyone to expand capacity," said Fiona Scott Morton, professor of economics at Yale and a former deputy attorney general in the antitrust division of the Justice Department.  "And when there aren't enough seats, airlines raise prices.  That's what we've been seeing."

65.     The statements of the various airline executives and the pressure placed on Southwest at the IATA meeting had the desired effect.  The New York Times article also noted, "after coming under fire at this week's conference, Southwest quickly moved to reassure investors it isn't going rogue.  'We have taken steps this week to begin pulling down our second half 2014 to manage our 2015 capacity growth . . .' Kelly said."

66.     On information and belief, these public confirmations that Defendants were restricting capacity were not the only method by which Defendants confirmed their continuing adherence to the conspiracy.  As discussed below, the Department of Justice has initiated an investigation into Defendants' communications with each other about capacity discipline.  This fact combined with the empirical and economic evidence (discussed further in Section H, *infra*) indicates that Defendants did, in fact, directly communicate and conspire with each other regarding capacity constraints.

67.     As further discussed below, the Department of Justice is also investigating Defendants' communications with large shareholders regarding capacity discipline and "industry capacity."  Approximately 77% of airline stock is owned by institutional investors, several of which are common between Defendants and regularly meet with them to discuss Defendants'

ongoing business operations and future plans.[12]  At least one of these institutional investors has admitted that "high on the list of topics" discussed in these communications is to urge that the corporations in which they invest—*e.g.*, Defendants—"throw the switch from developing market share to instead exercise market power to get margins up."[13]  In other words, these institutional investors encouraged and strategized ways for Defendants to refrain from attempting to take each other's market share and instead try to maximize the dollars they were able to squeeze from their existing market share.  In the airline industry, which is mature and has largely already figured out the best way to minimize costs, that meant figuring out ways to mutually raise airfares without losing market share to the competition.  Capacity discipline was one of the main ways Defendants did so.

68.     On information and belief, these shareholders—several of which had large stakes in multiple Defendants at once—helped coordinate Defendants' conspiratorial capacity discipline and acted as conduits of information between Defendants regarding capacity restraints. Through these conduits, Defendants were able to conspire and effectuate their capacity maintenance and reduction efforts so that no one Defendant increased capacity beyond the cartel's preferred rates.

## D.     Defendants Reduce Airfare Price Transparency

69.     Defendants have also facilitated the conspiracy by reducing price transparency within the industry offered by OTAs and metasearch websites.[14]  The purpose of these efforts is

---

[12]   José Azar, Martin C. Schmalz & Isabel Tecu, *Anti-Competitive Effects of Common Ownership*, at 14, Stephen M. Ross School of Business, University of Michigan, Working Paper No. 1235 (Apr. 21, 2015), *available at* http://ssrn.com/abstract=2427345.

[13]   *Id.* at 35.

[14]   A metasearch travel site is one in which an online user may compare prices from several different travel sources, such as the airlines and OTAs.  Some of the most well-known

both to eliminate comparison shopping (and the competition it brings) and increase prices by driving online ticketing traffic to Defendants' own websites or reducing the benefits of using OTAs and metasearch sites.

70.     On May 19, 2015, the Travel Technology Association issued a report prepared by Charles River Associates and authored by Dr. Fiona Scott Morton entitled "Benefits of Preserving Consumers' Ability to Compare Airline Fares" (the "TTA Report").  The TTA Report noted that competition within the U.S. airline industry had suffered because of domestic passenger airline mergers and the major airlines' collective efforts to lead travelers away from OTAs.

71.     By providing comparisons among different airlines' prices for the same routes, OTAs facilitate price transparency.  On information and belief, each of the Defendants have demanded that OTAs, both large and small, agree to onerous terms that would prevent the OTAs from providing accurate price comparisons for consumers, force the OTA to refrain from offering any further price comparisons at all, or add on fees to consumers for using OTA services that would erase any benefit to having the price transparency that OTAs provide.  The airlines' coordinated efforts to restrict OTAs' ability to provide such comparisons and price reductions was and remains a blatant attempt to drive up prices.

72.     Along these lines, the TTA Report found, among other things, that:

•     Restrictions by airlines of broad access to airline information—*i.e.*, prices and schedules—substantially reduce consumer welfare.  The TTA Report estimates the potential reduction in net consumer welfare of limiting airline price and schedule information to only

---

metasearch sites include Kayak, TripAdvisor, Google Flights, Hipmunk, Skyscanner, and Fly.com.

airline websites could exceed $6 billion per year.  In addition, such restrictions may result in up to 41 million passengers annually choosing not to fly.

- Beyond independent price comparisons, OTAs and metasearch travel sites provide consumers with other travel information, such as suggestions for places to go and things to do.  Supplementing airline schedule information with complementary information and products expands the market for air travel, further increasing consumer welfare.  Restricting airline schedule information has the opposite effect.

- Airline markets are highly concentrated, with significant barriers to entry. The recent merger of American Airlines and US Airways, for example, has led to fare increases in affected city-pair markets that are about 4 percent higher than in non-affected markets.[15]  In certain city-pair markets in which the American-US Airways merger reduced the number of significant competitors from 3 to 2, or from 2 to 1, fare increases have been 7 to 17 percent.  The welfare-enhancing impacts of broad access to airfare and schedule information may be even larger in duopoly or monopoly city-pairs.

- Airline profits globally are at an all-time high, expected to reach $25 billion for 2015.  While airline fuel prices declined nearly 25 percent last year, average domestic airfares have remained flat while ancillary revenue of the major U.S. airlines grew to over $15 billion in 2014.

73.     The TTA Report also notes that Defendants have engaged in coordinated efforts to stifle online metasearch airfare websites.  These efforts include:  prohibiting metasearch sites from referring consumers to an OTA for booking a flight; prohibiting OTAs from providing

---

[15]  "City-pair" refers to the two cities on either side of an airline route.  Thus, a flight between Washington, D.C. and New York is considered the "D.C.-New York city-pair."

airline information to metasearch sites; prohibiting global distribution systems ("GDSs")[16] from providing airline price and schedule information to "unauthorized" metasearch sites; prohibiting onward-distributing flight schedule information to metasearch sites by services such as Innovata; refusing to pay metasearch sites for direct referrals to the airline's own booking website; and prohibiting metasearch sites from displaying price information of the airline.

74.     Each of the four Defendants has engaged in the activities discussed above.  On information and belief, the value to Defendants of quashing competition that OTAs and metasearch sites provide could be as much as $30 per passenger.

**E.     United States Senator Richard Blumenthal (D-CT) Raises Awareness Regarding the Airlines' Conspiratorial Activities**

75.     On June 17, 2015, shortly after the *New York Times* published its article, the United States Senator for Connecticut, Richard Blumenthal, wrote a letter to the Assistant Attorney General for the United States Department of Justice Antitrust Division, William Baer. With respect to the withdrawal by Southwest of its plan to increase capacity, Senator Blumenthal stated, "The conclusion seems inescapable that the remarks made at IATA were targeted at Southwest and that its capitulation was the result of the 'fire' aimed at the company."

76.     Senator Blumenthal urged the DOJ to investigate conspiracy in the airline industry, stating, "As you know from the Department of Justice's (DOJ's) investigation into US Airways' merger with American Airlines in 2013, most airlines have traditionally viewed capacity reductions as a highly valuable way to artificially raise fares and boost profit margins.

---

[16]   GDSs are the intermediaries between OTAs and airlines that aggregate flight information across airlines.  GDSs link directly to airlines' reservation systems and enable travel agents with a single connection to a GDS to book flights with all of the airlines.  GDSs also offer OTAs competitive rates of compensation for their distribution services, which enables OTAs to offer lower prices to travelers.

In light of the recent unprecedented level of consolidation in the airline industry, this public

display of strategic coordination is highly troubling."

77.     Senator Blumenthal's letter went further, recalling the DOJ's previous concerns

raised during its investigation into the US Airways/American merger:

> The Complaint specifically documented the troubling history of US Airways
> communicating directly to a rival airline that it was upset by that airline's efforts
> to compete more aggressively.  In 2010, senior executives at US Airways
> complained that competition from the rival airline was "hurting profitability" in
> the industry.  DOJ wrote:  "[S]enior management debated over email about how
> best to get the rival airline's attention and bring it back in line with the rest of
> industry…[The CEO] urged the other executives to, 'portray these guys as idiots
> to Wall Street and anyone who'll listen.'"

> The Justice Department also correctly predicted that this kind of behavior would
> continue should the merger be allowed to proceed – as it ultimately was.  In the
> original complaint, DOJ wrote, "The structure of the airline industry is already
> conducive to coordinated behavior . . . the legacy airlines closely watch the
> pricing moves of their competitors.  When one airline 'leads' a price increase,
> other airlines frequently respond by following with price increases of their own."

78.     Finally, Senator Blumenthal concluded with a plea to act:

> I therefore urge the Antitrust Division to conduct a full and thorough investigation
> of anticompetitive, anti-consumer conduct and misuse of market power in the
> airline industry, evidenced by recent pricing patterns as well as remarks made at
> the IATA conference.  Consumers are paying sky-high fares and are trapped in an
> uncompetitive market with a history of collusive behavior.  If you find that these
> comments were coordinated to punish Southwest Airlines' announcement of
> capacity increases, I urge you to use all the tools at your disposal to punish this
> anti-competitive and anticonsumer behavior.

**F.     The Department of Justice Initiates an Investigation Into Defendants' Conspiracy**

79.     The DOJ acted promptly, and on July 1, 2015, a variety of news outlets reported

that the DOJ had sent civil investigative demands ("CIDs") to a number of airlines the day

before.  A spokesperson for the DOJ, Emily Pierce, confirmed this report, stating that the DOJ

was investigating "possible unlawful coordination" to limit capacity increases, thereby keeping

ticket prices high.  All four Defendants have publicly confirmed that they received CIDs from

the DOJ and that the DOJ's Transportation, Energy and Agriculture Section in Washington, D.C. is handling the investigation.

80.     On September 22, 2015, Bloomberg reported that the DOJ issued an additional set of CIDs to the Defendants, this time for details about meetings with the Defendants' major shareholders in which "industry capacity" was discussed.  The investors about whom the DOJ sought information were those whose stakes in the airlines exceed 2 percent of the companies' ownership, a category that includes some of the biggest U.S. money managers.  The DOJ also sought documents about the Defendants' meetings with financial analysts, including, on information and belief, analysts that cover the domestic airlines industry,

81.     According to the DOJ's Antitrust Division Manual, last updated in April 2015, before a CID is issued, a section or field office must be authorized to conduct a preliminary investigation into a potential antitrust violation.  In order to obtain authorization for a preliminary investigation, several factors are considered, the first one being "whether there is reason to believe that an antitrust violation may have been committed."  Ch. III § B(1).  Furthermore, "[i]n a civil matter, from the outset, attention should be given to the legal theory, relevant economic learning, the strength of likely defenses, any policy implications, the potential doctrinal significance of the matter, and the availability of an effective and administrable remedy.  *The greater the potential significance of the matter, the more likely the request to open an investigation will be approved*."  *Id.* (emphasis added).

82.     On July 1, 2015, George Jepsen, the Attorney General of the State of Connecticut, announced that his office was also conducting an investigation into conspiratorial activity among air carriers, and had sent letters to American, Delta, Southwest, and United.

83.     Senators Blumenthal and Schumer publicly applauded the DOJs investigation of Defendants.  Senator Blumenthal stated, "This investigation must be tireless and timely to save consumers from the onslaught of price increases in summer fares that may result from conspiratorial and anticompetitive airline company misconduct."  Senator Schumer agreed, "It's hard to understand, with jet fuel prices dropping by 40 percent since last year, why ticket prices haven't followed . . . .  We know when airlines merge, there's less price competition."

**G.     Defendants Successfully Limit Capacity and Reap Supracompetitive Profits As a Result**

84.     Defendants' collective actions have succeeded in limiting and stabilizing airline capacity, and as a result, Defendants have inflicted supracompetitive prices on Plaintiff and the Class throughout the Class Period.

85.     Defendants have confirmed that, despite an improving economy and increased demand for domestic air travel, Defendants have conspiratorially exercised strict capacity discipline throughout the Class Period.  For example, as Southwest announced in its annual filing for 2014, "Although the U.S. economy has experienced a moderate recovery since emerging from a recession in 2009 and the U.S. airline industry has showed measurable improvement during 2013 and 2014," ostensibly because of "economic uncertainty," there has been "continued *industry restraint* with respect to overall capacity (number of available seat miles)," and "many U.S. air carriers, including Southwest, experience relatively flat to modest year-over-year increases in capacity during 2014" (emphasis added).  As a result, "overall domestic airline industry capacity in 2014 remained below pre-recession levels."

86.     Defendants have charged supracompetitive prices as a result of these capacity restraints, and simultaneously reaped huge profits from their conspiracy.  Department of Transportation data shows that average domestic airfares rose at an inflation-adjusted 13 percent

from 2009 to 2014.  The airline industry has earned a combined $19.7 billion in profits in the

past two years, and the IATA predicts that North American airlines will obtain approximately

$13.2 billion in net after-tax profits in 2015.  As Senator Schumer noted, airlines were set to

make a profit of $7.08 per passenger in 2015, up from $6.02 in 2014 and $3.38 in 2013.

87.     Defendants attributed their improved profitability to consolidation and their

collective capacity constraints.  As Southwest stated, for example, "Leaner flight schedules over

the past several years, along with industry consolidation, have contributed to improvements in

industry load factors (percentage of seats filed by fare-paying passengers) and yields (revenue

production per passenger mile)."

**H.     Economic Evidence Demonstrates the Conspiracy in Action**

88.     The Department of Transportation maintains extensive data on the airline industry

and produces quarterly reports summarizing key data on domestic routes.  The data the

Department of Transportation collects is typically submitted five to six months following the

quarter the data represents, and the Department of Transportation will not report on the data until

it is deemed accurate and complete.  For 2003 through 2014, the Department of Transportation

reported data covering over 150,000,438 observations for average, highest, and lowest airfares

among routes, corresponding to approximately 3,500 unique routes.

89.     The operation of the conspiracy and its effects on the market are confirmed by the

facts that:  (1) after years of capacity increases, and contrary to increasing demand, airline

capacity remained stable from 2011 onward; (2) as Defendants maintained capacity discipline,

airfares increased to unprecedented, supracompetitive levels; (3) fares continued to climb even as

airlines became more fuel efficient and fuel prices remained flat or decreased; and (4) actual

airfare prices significantly inflated above predicted prices beginning around 2011.  Only the

conspiracy by Defendants reasonably explains these stark changes in capacity discipline, prices, and income during the Class Period.

> **1.** **Following Years of Steady Increases, Passengers Per Route Suddenly and Inexplicably Stabilized During the Class Period**

90.     The Department of Transportation data can be used to estimate the average number of daily passengers per route.  Absent a market infected by Defendants' conspiracy, the number of passengers per route would be expected to increase when the economy is strong, as was the case from 2003 to 2007, and decrease when the economy is weak, as happened during the recession of 2007 to 2009.

91.     After the recession, however, the number of passengers per route has remained stable, even as the economy improved.  This was a marked departure from the historic pattern in average daily passengers that existed before 2011, and there is no apparent reason why this number would have suddenly stabilized even as demand for domestic air travel once again began increasing.  But that is exactly what the data reveals happened during the Class Period.

92.     The below chart shows the average number of daily passengers per route for 2003 through 2014.  The chart accounts for quarterly seasonality and shows that the number of passengers per route increased from 2003-2007, declined between 2007-2009, and then remained flat through 2014.



2.   **Capacity Discipline During the Class Period Leads to Unprecedented Airfare Increases**

93.     With capacity constrained, airlines have imposed record airfare increases.  The average domestic flight in 2014 cost $392, the highest annual fare since the Bureau of Transportation began collecting air fare records in 1995, and 2.5 percent higher than the previous high of $382 in 2013.  *See* http://www.rita.dot.gov/bts/press_releases/bts021_15.  When adjusted for inflation, fares are at a 12-year high.

94.      The following chart shows the average quarterly fares and adjusted quarterly fares from 2003 through 2014.  The purple line shows average quarterly fares without any modifications.  During the earlier period reflected in this chart, fares often included baked-in ancillary fees; in the later period, fares often did ***not*** include ancillary fees, which Defendants began breaking out as additional fees beyond the fare itself.  To control for any effect passenger fees may have had on total airfares, the green line therefore shows the average adjusted quarterly

fare, which includes ancillary fees for all periods (which allows for an apples-to-apples comparison across fares and time). As the chart demonstrates, regardless of whether passenger fees are included in the price of air travel or not, airfares steadily increased to and exceeded record levels throughout the Class Period.



95.     The difference in average airfares before 2011 and after 2011 also demonstrates the break that occurred in that year. From 2003 through 2010, the average fare was about $195, but from 2011 through 2014, the average fare jumped to $237. To see the stark difference between average airfares before 2011 and after 2011, this chart shows average quarterly fares for 2003 through 2010 in blue, and average quarterly fares for 2011 through 2014 in red.



96.     The dramatic change in the *growth rate* of airfares before and after 2011 also demonstrates the break that occurred in that year.  While average fares grew only 4.3% from 2003 through 2010, average fares soared almost 13% from 2011 through 2014.  The next chart visualizes this sharp increase by showing the growth rate of average quarterly fares for 2003 through 2010 in blue, and the growth rate of average quarterly fares for 2011 through 2014 in red.



97.     But increases in fares were not the only change that occurred in 2011.  Domestic

airfares have also become more similar to each other across routes, showing a homogenization in

approach to airfares that was not previously present in the domestic airline industry to the same

extent.  From 2003 through 2010, the average variation in fares was approximately 30%, while

from 2011 through 2014, the average variation in fares dropped to about 26%.  A decrease in

price variability is an important indicator of conspiratorial behavior, particularly when observed

in conjunction with price increases and structural changes leading to sharp price increases.  To

see the reduction in fare variability in the airline industry, the below chart shows the average

quarterly normalized dispersion of fares across routes for 2003 through 2010 in blue, and the

average quarterly normalized dispersion of fares across routes for 2011 through 2014 in red.



98.     The inexplicable phenomenon (absent conspiracy) that this data represents is that domestic airfare prices suddenly began increasing during the Class Period in spite of market fundamentals while, *at the same time*, differences between those airfares on the same routes decreased.  This sudden shift toward homogeneity and higher prices is the hallmark of conspiracy between competitors.

### 3.     Airfares Continue to Climb Even As Fuel Efficiency Improves and Fuel Prices Remain Flat

99.     Defendants' conspiratorial capacity constraints also manifested themselves in the way domestic airline ticket prices failed to respond to recent dramatic decreases in fuel costs. Because fuel is the largest operating cost for airlines, lower fuel costs should result in lower fares in a competitive market.  However, Defendants' ticket prices have not decreased, and have instead increased, all while the price of fuel dropped over the past four years and while aircrafts' fuel efficiency simultaneously improved.

100.     As long as capacity is limited, there is no incentive for airlines to reduce fares no matter how low fuel prices go.  And this is exactly what has happened in practice.  Although jet fuel prices have significantly declined over the last four years, the price of domestic airfare has actually *increased*, which further demonstrates the pervasiveness of Defendants' conspiracy.

101.     Airfares continued to increase even as airplanes became much more fuel-efficient heading into and during the Class Period.  The Department of Transportation reports data on factors relevant to fuel efficiency, including (among others) aircraft miles, available seat, passenger miles, fuel consumed, seats per aircraft, seat miles per gallon, and energy intensity. This data can be used to construct a quarterly time series that measures the average fuel consumption per passenger mile, which can then be compared to domestic airfare prices.

102.     The below chart assembles the Department of Transportation data and shows historical airplane fuel efficiency, measured by average fuel consumption per passenger mile through 2012.[17]  As the chart demonstrates, airplanes became dramatically more fuel-efficient since 2003.

---

[17]   Data are not available for 2013 and 2014, and Plaintiff therefore assumed (in order to be conservative) that there were no fuel efficiency gains over those two years, even though the clear technological trend was that there was, in fact, gains in that time.



103.    In the same time period, fuel prices stabilized and then began to decrease during the Class Period.  The below chart compares the growth rate of oil prices before 2011 and after 2011.  The chart shows the growth rate of oil prices from 2003 through 2010 in blue, and the growth rate of oil prices from 2011 through 2014 in red.  This chart demonstrates that oil prices increased almost 150% from 2003 through 2010, but remained relatively stable from 2011 through 2014.



104.    Nevertheless, airfares continued to rise.  In a competitive environment, airlines would be expected to use more stable fuel prices and improved fuel efficiency as a reason to *reduce* fares in order to win business and market share.  Airlines would ***not*** be expected to continue raising fares to unprecedented levels in spite of reduced costs.  A rational economic actor could only take this action if it knew that its ostensible competitors would do the same.  So it was with the airlines, who colluded to exercise capacity constraint and keep airfares high.

**4.    Starting Around 2011, Airline Prices Experience a Structural Break as Actual Prices Become Significantly Inflated Above Predicted Prices**

105.    In addition to the above analyses, the Department of Transportation's data can also be used to predict airline prices that would exist absent conspiracy, and to test whether prices have been higher in the Class Period than market fundamentals would predict.  If they are, this is evidence that prices did not act as they should, which is explained by Defendants' anticompetitive conspiracy.

106.    One method that can be used to predict airfare prices based on the Department of Transportation data is to create a model that analyzes the relationships between airline industry market fundamentals and domestic airfare prices.  By running that model on data from the pre-Class Period era, it is capable of predicting what Class Period prices should have been, based on then-present market fundamentals.  This type of model can then be used to compare the actual prices during the Class Period against the but-for prices the model predicted.

107.    This type of model can also include a variable for industry concentration to control for the (legitimate) effect that higher concentration may have on prices.  And the model may be run to include all routes, or it can be run to include only the routes that existed throughout the entire time period, in order to control for any effects resulting from entry or exit of routes.

108.    The following chart shows the results of such a model using all routes (not controlling for route changes).  The blue line represents actual prices and the red line represents the model's predicted prices.  As the chart demonstrates, until 2011, the model very closely predicted actual prices.  However, in 2011 and later, there was a structural break in airline prices and actual prices began to significantly exceed predicted prices.



109.    These results indicate the same inexplicable (absent conspiracy) phenomenon when the model uses only the routes that existed throughout the entire estimation window (controlling for route changes).  In the below chart, the blue line represents actual prices and the red line represents predicted prices.  These results once again demonstrate a structural break in 2011, when actual prices began to significantly exceed predicted prices.



110.     The effect of the conspiracy on prices can thus be seen throughout the Class

Period, with actual prices being inflated above their predicted levels for each quarter during the

Class Period for which data was available from the Department of Transportation.  The below

chart shows the difference between actual and predicted average quarterly fares from 2011

through 2014.  All differences are positive, meaning that actual prices were higher than what

they should have been.



111.    Comparing the difference between actual and predicted fares for 2003-2010 to the

difference between actual and predicted fares for 2011-2014 further demonstrates the clear

change that occurred around 2011.  The following chart shows the average dollar difference

between actual and predicted quarterly fares as a percentage of predicted quarterly fares for 2003

through 2010 in blue, and for 2011 through 2014 in red.  The chart shows that, from 2003

through 2010, the average difference between actual and predicted prices was only 1.33%,

meaning that actual and predicted prices were closely aligned before 2011.  After 2011, however,

the average difference between actual and predicted prices was 9.79%, meaning that, after 2011,

there was significant price inflation unexplained by market fundamentals.



**I.       The Structure and Operation of the Airline Industry Further Reflect Conspiracy**

112.     A number of characteristics of the airline industry, its structure, and the manner in which Defendants have operated in the market during the Class Period created the quintessential business environment conducive to price fixing and indicate that Defendants did, in fact, conspire.

113.     *First*, the airline industry is highly concentrated, creating an environment conducive to conspiracy among the remaining dominant firms – the four Defendants.  When American merged with US Airways, the industry became even more concentrated, with the four Defendants now controlling over 80% of flights within, to, or from the United States, and approximately 70% of the domestic airline market.  The more concentrated an industry, the easier it is for the remaining firms in the industry to conspire.  Indeed, during the American and US Airways merger case, the DOJ expressed concern that further consolidation in the airline industry would lead to increased coordination among the remaining airline carriers, stating

before the merger made the industry even more concentrated that "[t]he structure of the industry is already conducive to coordinated behavior."

114.    *Second*, the airline industry has significant barriers to entry, which removes the threat to Defendants that sufficient new competitors could enter the industry and constrain Defendants' conspiracy.  These entry barriers include the need for government clearance to operate an airline along approved flight paths, the high cost of building out an airline fleet, the finite number of gates at airports throughout the nation, and the difficulty in obtaining initial or constant access to such gates.

115.    *Third*, airline services are homogenous and interchangeable across Defendants. When passengers decide between airlines, they primarily do so based on price.  The service offered by airlines – the movement of passengers between origin and destination – is the same across domestic airlines.  Any differences that exist between airlines are eliminated, because airlines must invest in similar airplanes, technology, and infrastructure as they strive to eliminate any service or safety deficiencies that might exist.  That passengers primarily choose between airlines based on price creates strong incentives for airlines to fix prices by conspiring.

116.    *Fourth*, demand for airline services is relatively inelastic, making Defendants' conspiracy more effective as the airlines can sustain artificial price increases without driving so many customers away that the price increases become unprofitable.  Since the 1970s, overall price elasticity for domestic air travel has been inelastic.  Airline passengers for most routes have no practical alternative but to travel by air, making demand for airline services inelastic and the market for domestic air travel even more conducive to conspiracy.

117.    *Fifth*, airline pricing is transparent and easily monitored, and is conducive to real-time communications and conspiracy among competitors.  The DOJ has noted that airlines

closely watch each other's fares and consistently match each other's fare increases in real time. The fact that such pricing information is available at the individual airline and route level facilitate further a conspiratorial outcome. For example, Defendants can rely on ATPCO to publish the latest airfares for more than 500 airlines multiple times per day. In addition, the airlines have proven that price transparency in the industry can be used to deter price competition. Using cross-market incentives, when one airline offers discounts in one region, an ostensible competitor airline will often respond with discounts in another region in which the original discounting airline prefers a higher fare, resulting in the fare discounts being withdrawn all together. The airline industry is therefore structured such that colluding airlines are able to identify and quickly punish any airlines that "cheat" on the agreement, creating a strong enforcement mechanism for the conspiracy.

118.    *Sixth*, Defendants have numerous opportunities to meet and hold discussions on capacity and pricing. Defendants are members of trade associations, including, among others, Airlines for America and the IATA. At these trade associations, all four Defendants can and do meet with each other to discuss various aspects of their business. Defendants also maintain a network of financial analysts and other channels they can use to communicate with each other.

119.    The frequency with which the individual price data is available – in real time – and the frequency with which Defendants meet at various industry gatherings not only facilitate the establishment of Defendants' conspiracy, but also enhance its sustainability over time.

120.    Furthermore, the multimarket contact among Defendants not only facilitates the conspiracy (because it streamlines geographic market allocation and increases payoffs among cartel members), but it also enhances the ability to punish "cheaters," as cheating in one market can be punished in another market.

121.     *Seventh*, Defendants have a history of direct communications with each other

regarding competitive issues.  As the DOJ explained in its 2013 complaint:

> In 2010, one of US Airways' larger rivals extended a "triple miles" promotion
> that set off a market share battle among legacy carriers.  The rival airline was also
> expanding into new markets and was rumored to be returning planes to its fleet
> that had been mothballed during the recession.  US Airways' CEO complained
> about these aggressive maneuvers, stating to his senior executives that such
> actions were "hurting [the rival airline's] profitability – and unfortunately
> everyone else's."  US Airways' senior management debated over email about how
> best to get the rival airline's attention and bring it back in line with the rest of the
> industry.  In that email thread, US Airways' CEO urged the other executives to
> "portray[ ] these guys as idiots to Wall Street and anyone else who'll listen."
> Ultimately, to make sure the message was received, US Airways' CEO forwarded
> the email chain—and its candid discussion about how aggressive competition
> would be bad for the industry—directly to the CEO of the rival airline.  (The
> rival's CEO immediately responded that it was an inappropriate communication
> that he was referring to his general counsel.)

122.     *Eighth*, Defendants each have common large shareholders that regularly

communicate with Defendants regarding current business conditions and future plans.  Due to

their cross-ownership, these shareholders are motivated to increase industry profitability rather

than individual Defendants' profitability.  Therefore, this cross-ownership acts as a strong and

durable conduit of information in furtherance of Defendants' conspiracy.

123.     *Finally*, the airline industry has been the subject of manipulation and antitrust

enforcement in the past.  For example, as the DOJ explained in the American-US Airways

merger case, the airlines "have previously used ATPCO to engage in coordinated behavior.  In

1992, the United States filed a lawsuit to stop several airlines, including [American and US

Airways], from using their ATPCO filings as a signaling device to facilitate agreements on fares.

That lawsuit resulted in a consent decree, now expired."  This history of anticompetitive

practices in the industry, coupled with the airlines' continued ability to discuss and confirm with

each other regarding agreements on fares, makes conspiracy even more likely.

## ACCRUAL OF CLAIM, CONTINUING VIOLATION,
## EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT

124.    Plaintiff did not discover and could not discover through the exercise of reasonable diligence the existence of the conspiracy alleged herein prior to the 2015 comments cited in this complaint.  Before Defendants' recent conspiratorial statements regarding "capacity discipline," it was not reasonably apparent that they were each engaged in the same practices.

125.    Defendants and their co-conspirators have committed continuing violations of the antitrust laws resulting in monetary injury to Plaintiff and Class members.  These violations constitute injurious acts that restart the applicable statute of limitations each time they are committed.

126.    In addition, Defendants' and their co-conspirators' agreement, understanding, and conspiracy in violation of the antitrust laws was kept secret.  As a result, Plaintiff and the Class members were unaware of Defendants' unlawful conduct alleged herein and did not know that they were paying supracompetitive prices for domestic airline tickets throughout the Class Period.  Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

127.    Plaintiff and the Class members did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until shortly before this litigation was initially commenced, because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations.

128.    Neither Defendants nor their co-conspirators told Plaintiff or other Class members that they were fixing prices, or engaging in the other unlawful conspiratorial practices alleged

herein. By its very nature, Defendants' and their co-conspirators' conspiracy was inherently self-concealing.

129. On information and belief, Defendants and their co-conspirators engaged in a successful price-fixing conspiracy, which they affirmatively concealed:

        a.       by meeting secretly (including use of private telephonic communications) to discuss prices, customers, capacity, and markets for domestic airline tickets sold in the United States and elsewhere;

        b.       by agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the true conspiratorial nature and substance of the acts and communications in furtherance of their illegal scheme;

        c.       by holding secret meetings outside and separate from the formal trade association meetings Defendants were publicly attending; and

        d.       by disguising price-fixing meetings and communications as technical and operational meetings.

## ANTITRUST INJURY

130. The unlawful contract, combination and/or conspiracy alleged above had and is having, *inter alia*, the following effects:

        a.       Prices charged by Defendants and their co-conspirators to Plaintiff and the members of Class for domestic airline tickets were maintained at artificially high and supracompetitive levels;

        b.       Plaintiff and members of the Class were required to pay more for domestic airline tickets than they would have paid in a competitive marketplace unfettered by Defendants' and their co-conspirators' conspiratorial and unlawful price-fixing; and

      c.      Plaintiff and members of the Class have been deprived of the benefits of free, open and unrestricted competition in the market for domestic airline tickets.

131.    During and throughout the period of the contract, combination or conspiracy alleged above, Plaintiff and members of the Class directly purchased domestic airline tickets in the United States.

132.    Plaintiff and the other Class members paid more for the domestic airline tickets than they would have paid under conditions of free and open competition.

133.    As a direct and proximate result of the illegal combination, contract or conspiracy alleged above, Plaintiff and the members of the Class were injured and financially damaged in their businesses and property, in amounts that are not presently determined.

134.    This is antitrust injury of the type that the federal laws were meant to punish and prevent.

## CLAIMS FOR RELIEF

### COUNT I

**(For Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act)**

135.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

136.    Beginning at a time presently unknown to Plaintiff, but at least as early as July 2011 and continuing through the present, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade in violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

137.    In furtherance of the unlawful conspiracy, each of the Defendants and their co-conspirators has committed overt acts, including, *inter alia*:

a.      agreeing to charge prices at certain levels and otherwise to fix, increase, maintain and/or stabilize prices for domestic airline tickets sold in the United States;

b.      participating in meetings, conversations, and communications with co-conspirators regarding prices to be charged for domestic airline tickets;

c.      meeting with co-conspirators in order to keep the existence of the conspiracy unknown as to foster the illegal anti-competitive conduct described herein; and

d.      refraining from competing by refusing to offer domestic airline tickets at prices below the agreed-upon fixed price.

138.    The combination and conspiracy alleged herein has had the following effects, among others:

a.      Price competition in the sale of domestic airline tickets has been restrained, suppressed, and/or eliminated;

b.      Prices for domestic airline tickets sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels; and

c.      Those who purchased domestic airline tickets directly or indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

139.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of domestic airline tickets.

140.    As a direct and proximate result of Defendants' illegal agreement, contract, combination trust and/or conspiracy, Plaintiff and the members of the Class have been injured

and damaged in their respective businesses and property in an amount to be determined

according to proof and are entitled to recover threefold the damages sustained pursuant to

Section 4 of the Clayton Act, 15 U.S.C. § 15.

141.    The conduct of Defendants and their co-conspirators constitutes a per se violation

of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## COUNT II

### (For Violation of Section 3 of the Sherman Act and Section 4 of the Clayton Act)

142.    Plaintiff incorporates by reference as if fully set forth herein the allegations

contained in the preceding paragraphs of this Complaint.

143.    Beginning at a time presently unknown to Plaintiff, but at least as early as July

2011 and continuing through the present, Defendants and their co-conspirators entered into a

continuing agreement, understanding, and conspiracy in restraint of trade in violations of

Section 3 of the Sherman Act, 15 U.S.C. § 3, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

144.    In furtherance of the unlawful conspiracy, each of the Defendants and their co-

conspirators has committed overt acts, including, *inter alia*:

a.    agreeing to charge prices at certain levels and otherwise to fix, increase,

maintain and/or stabilize prices for domestic airline tickets sold in the United States;

b.    participating in meetings, conversations, and communications with co-

conspirators regarding prices to be charged for domestic airline tickets;

c.    meeting with co-conspirators in order to keep the existence of the

conspiracy unknown as to foster the illegal anti-competitive conduct described herein; and

d.    refraining from competing by refusing to offer domestic airline tickets at

prices below the agreed-upon fixed price.

145. The combination and conspiracy alleged herein has had the following effects, among others:

a. Price competition in the sale of domestic airline tickets has been restrained, suppressed, and/or eliminated;

b. Prices for domestic airline tickets sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels; and

c. Those who purchased domestic airline tickets directly or indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

146. Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful arrangements to fix, maintain, raise and/or stabilize prices of domestic airline tickets.

147. As a direct and proximate result of Defendants' illegal agreement, contract, combination trust and/or conspiracy, Plaintiff and the members of the Class have been injured and damaged in their respective businesses and property in an amount to be determined according to proof and are entitled to recover threefold the damages sustained pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

148. The conduct of Defendants and their co-conspirators constitutes a per se violation of Section 3 of the Sherman Act, 15 U.S.C. § 3.

## PETITION FOR RELIEF

WHEREFORE, Plaintiff petitions that:

A.      The Court determine that this action may be maintained as a class action under Rule 23 (a) and (b) of the Federal Rules of Civil Procedure, that Plaintiff be appointed class representative and that Plaintiff's counsel be appointed as counsel for the Class.

B.      The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including that the agreement, contract, combination, or conspiracy and the acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 & 3, and that Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with the costs of the action, including reasonable attorneys' fees, pre and post-judgment interest.

C.      Each of the Defendants, successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of action as alleged herein.

D.      The Court award Plaintiff and members of the Class such other, further and different relief as may be necessary and appropriate.

## JURY DEMAND

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all claims asserted in this Complaint so triable.

Dated:  October 20, 2015

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

/s/ Jon Corey
Jon Corey (DC Bar No. 491311)
777 6th Street, NW, 11th Floor
Washington, DC 20001
Telephone:  (202) 538-8000

Stephen R. Neuwirth (*pro hac vice* application forthcoming)
Faith E. Gay (*pro hac vice* application forthcoming)
51 Madison Avenue, 22nd Floor
New York, New York 10010
Telephone:  (212) 849-7000

Adam B. Wolfson (*pro hac vice* application forthcoming)
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000

**BERNSTEIN LIEBHARD LLP**

Ronald J. Aranoff (*pro hac vice* application forthcoming)
Dana S. Smith (*pro hac vice* application forthcoming)
10 East 40th Street
New York, New York 10016
Telephone:  (212) 779-1414

**COHEN MILSTEIN SELLERS & TOLL, PLLC**

Kit A. Pierson (DC Bar No. 398123)
Daniel A. Small (DC Bar No. 465094)
Daniel H. Silverman (DC Bar No. 988862)
1100 New York Avenue, NW, Suite 500 West
Washington, DC 20005
Telephone:  (202) 408-4600

Theodore J. Leopold (DC Bar No. FL705608)
2925 PGA Boulevard, Suite 200
Palm Beach Gardens, Florida 33410
Telephone:  (877) 515-7955

*Attorneys for Plaintiff Israel Katz and the Class*